Criner *v.* McKee Glass Company et al., Appellants.

Argued April 14, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*H. Reginald Belden,* with him *Harold A. Stewart,* for appellants.

*Robert M. Carson* with him *Francis E. Criner,* for appellee.

OPINION BY ROSS, J., July 23, 1948:

This is an appeal from an award of workmen's compensation for the permanent loss of use of an eye.

The claimant, Joseph Criner, suffered an injury to his left eye on September 28, 1941, in the course of his employment with the McKee Glass Company. A traumatic cataract developed and an operation was performed for the removal of the cataract. After a hearing on the claimant's petition for compensation for the injury to his left eye, the referee found as a fact that "as the end result of his injury and accident of September 28, 1941, claimant has lost the vision of his left eye for all practical intents and purposes" and awarded compensation for 125 weeks under section 306(c) of our Workmen's Compensation Act for the permanent loss of use of the eye. The referee's findings of fact and the award were affirmed by the board, the employer's excep-

tions thereto were dismissed by the Court of Common Pleas of Westmoreland County, and this appeal was taken.

The Act of June 21, 1939, P. L. 520, 77 PS 513, was in force when the claimant was injured. In *Diaz v. Jones & Laughlin Steel Corp.*, 155 Pa. Superior Ct. 177, 38 A. 2d 387, speaking thru President Judge KELLER, we said at page 183: "The amendment of June 4, 1937, P. L. 1552, had changed the Workmen's Compensation Act of 1915, P. L. 736, by providing that permanent loss of the use of an eye *for industrial purposes* should be considered as the equivalent of the permanent loss of the eye. But the Act of 1939, P. L. 520, which governs this case, struck out the words 'for industrial purposes', and restored the clause, in that respect, to the language of the original act, which had been correctly interpreted by Judge HORACE STERN (now a Justice of the Supreme Court) when he was on the common pleas bench, to mean, not the permanent loss of the use of the eye *for industrial purposes*, but the permanent loss of its use *for all practical intents and purposes*." Cf. *Wildman v. Pa. Dept. Highways*, 157 Pa. Superior Ct. 301, 43 A. 2d 342. Consequently, in the instant case, as in the *Diaz* and *Wildman* cases, the question before the compensation authorities was whether the claimant had permanently lost the use of his left eye for "all practical intents and purposes", and they resolved this question in the claimant's favor.

A medical witness for the claimant, Dr. Curry, who had made an examination of the claimant on June 21, 1945, testified that the claimant has "vision amounting to only hand movements at a distance of six or eight inches, and that is most essentially loss of vision in that eye". He testified further as follows: "Q. Did your examination indicate whether by further operation the eye could be helped? A. I do not believe that any further operation would benefit him. Q. Is there any other

method or procedure or treatment that could aid the eyesight in this particular left eye? A. No. . . . Q. Will time in any way aid or heal the present condition of that eye, doctor? A. It will not help it. Q. Doctor, what is his vision with a corrective lens if you tested it? A. Oh, it is practically nil—it amounts only to counting fingers. . . . Q. . . . with corrective lenses what vision was present in accordance with Snellen's Chart? A. He had 4/200 with the correction. Q. What vision did he have without this corrective lens? A. Counting movements, or distinguishing hand movements at a distance of six or eight inches. Q. What vision is that, according to Snellen's Chart? A. Practically none. . . . Q. . . . what is your opinion with respect to whether or not that man has loss of vision in this injured eye for all practical purposes? A. He has lost it. Q. And is or is not the condition permanent? A. It is permanent."

Dr. McCaslin, an impartial medical expert called by the referee, after testifying that the vision in the claimant's eye is 2/200 and that "the injury has reduced this man to one of monocular vision with the corresponding restriction of the field of vision which is characteristic of a monocular seeing person. It is impossible to develop with corrective lenses or other appliances binocular single vision", testified further: "Q. You say the vision in this eye, uncorrected is 2/200, but with a plus 12 sphere vision will be improved to 20/30? A. That's right. Q. Well, you say, doctor, it is impossible to develop with corrective lenses or other appliances binocular single vision? A. That's right. Q. Then we would assume that his vision in reality is not correctible—we must assume that the vision in this eye you say can not be corrected with a lens? A. We can not develop binocular single vision—in other words he can not use his two eyes together—with a lens on that eye he would see double. In other words, he has what is commonly classified as a reserve eye? A. That's right. . . . Q. And how much reserve vision does he have? A. 2/200 if he has

no aid to vision. . . . Q. . . . Now, how shall I classify your answer as to whether he has vision for all intents and purposes—do you think he has? A. He does not. Q. And this eye, as I understand your testimony, is not serving him to any extent now, but if he loses the good eye it will come back and give him some use and help him to carry on? A. If he loses the right eye he would be in about the same situation he is now—he would have to repair the left and would not have the use of the right. . . . Q. . . . do you classify the present condition in this eye as being permanent? Is there some medical procedure that can make this eye more useful to the man? A. His condition as existing at the present time will stay that way."

Dr. Kutscher, who removed the cataract from the claimant's eye, was called as a witness by the employer and after stating that the claimant "has a reserve left eye" testified: "Q. You say if he wore glasses he would have what you term industrial vision? A. Yes, but he would have to wear a glass to have industrial vision. Q. Did you recommend him to do that? A. He should not wear a glass over his left eye because if he does he will have the likelihood of double vision—they all have double vision. Q. What do you mean by double vision? A. He would see one image with his right eye and he would see the same image with his left eye, but with the left eye the image would be small and it would be at a different place in space than the image with the right eye. . . . Q. What do you mean when you say he has a reserve left eye, doctor? A. Well, if he should lose his right eye by virtue of some disease or injury, then he could have a lens for his left eye that would allow him to see full normal. . . . Q. Doctor, you say this man has a reserve eye? A. Yes. Q. Please tell us what reserve vision there is remaining in that eye? A. Without a lens? Q. Without a lens, yes, doctor. A. Without a lens the vision would be about 3/200."

It seems clear from the testimony of all the doctors that the claimant, so long as he has the use of his undamaged and normal right eye, is practically blind in his left eye. However, the defendant contends that the testimony shows the claimant's left eye to be a "reserve eye" and, therefore, under the authority of *Massett v. Armerford Coal M. Co.*, 82 Pa. Superior Ct. 579, he cannot recover for the permanent loss of its use.

The defendant's contention would be sound—assuming that the compensation authorities found that he had a so-called reserve eye—if the law of the Massett case were still the law of this Commonwealth. However, it was decided before the amendment of 1939 and its construction by this Court in *Diaz v. Jones & Laughlin Steel Corp.*, 155 Pa. Superior Ct. 177, 38 A. 2d 387, supra, and *Wildman v. Pa. Dept. Highways*, 157 Pa. Superior Ct. 301, 43 A. 2d 342, supra. In the *Diaz* case, Judge KELLER, who also had written the opinion in the *Massett* case, stated at page 183: ". . . counsel for the employer also persisted in asking the witnesses, as bearing on the permanent loss of the use of the left eye, whether claimant had sufficient vision in the left eye, prior to 1941, to do industrial work and paint, if *he had no vision in the right eye.* That was not the criterion. The standard was not, whether, before the accident in 1941, *with the right eye gone,* he could see sufficiently with the left eye to do his work as a painter; but, whether *using both eyes* he had better general vision than he would have with only the right eye. In other words, could he see better, in general, using the left eye in connection with his good right eye than by using the right eye alone? If he could, he had not lost the use of his left eye to such an extent as to be considered the equivalent of the permanent loss of the eye." Consequently, the *Massett* case was overruled—at least inferentially—by the *Diaz* case.

In this case, the claimant with or without a corrective lens over his injured eye has no better vision than if he

used his uninjured eye alone; he cannot use his eyes together, lens or no lens.

The finding of fact of the compensation authorities that the claimant has "lost the vision of his left eye for all practical intents and purposes" is supported by evidence of the required quality and quantity.

Judgment affirmed.